Please call the next case. Order 14-07-17, Paul Houchin v. Workers' Compensation Comm'n. Justice Holdridge, members of the court, Mr. Eldridge. My name is John Mitchell. I'm here on behalf of the petitioner, the injured worker below. My day has started out with a flat tire, and twice I have deleted my summary of these arguments, so I'm going to have a good day here today. Please pick on me, what the heck. This case involves two different arbitration hearings. The first one went up to the circuit court and stopped. In that case, the arbitrator found that the petitioner had sustained an accidental injury, that his condition was causally related to the accidental injury. They awarded him TTD, suggested the future surgery that was recommended, and then the case went up on appeal and sort of stopped dead. Dr. Ritter, who was the treating physician in 2007, did not find arthritis to be a big factor, and that's part of what the second decision deals with. The respondent had a physician named Mark Levin, L-E-V-I-N, who examined the petitioner, who agreed that if his accident occurred as he described, which the arbitrator found initially, that he had maybe a preexisting condition, but the conclusion was that there should be knee surgery and that the two were going to go together. Then, to get from the arbitration to the circuit court went from July of 2007 to, I think, May of 2010. During that period of time, the petitioner left the respondent and began working for another. When he left the respondent, he lost his group health. He had no health coverage whatsoever. While they're still appealing the case on the issue of accident and causation, no medical was furnished to him. As he went through his new job, actually the second job after he left this employer, he drove what was called a long haul. What he did is drive a semi for, I think it was 250 miles, but some distance, dropped the trailer, turned around, and came back. He did not do anything physical in the way of loading or unloading. He did not do anything, as his testimony indicates, nothing to aggravate or cause his condition to be worse. He had no intervening accidents. He did have some complaints about getting in and out of the truck, which he used his opposite leg, the left leg, which is the good one, to get in and out of the truck maybe three to five times a day, or a shift, I should say. It's not anything more unusual than a person walking down the street or up and down a set of stairs. When it came time to finally get to be seen by Dr. Ritter in December of 2010, the man was at the stage that he needed a total knee replacement. It was no longer a minisectomy. The original medical from 2007 did not show any real problem with the arthritis. The petitioner said he never had any complaints with his knee prior to the 2007 accident. He did not injure it between 2007 and the trial, excuse me, the visit to Dr. Ritter in 2010. At that point in time, the employer changed doctors. They did not have Dr. Levin, who was familiar with the case, do a second IME. They chose Dr. Nagulski. Dr. Nagulski is a doctor in St. Louis who is also an orthopedic surgeon. It is our position, and the reason why I'm here is I believe that Dr. Nagulski's evidence, the reliance upon Dr. Nagulski's report, is contrary to the evidence in the case. The commission had already found in 2007 that his knee condition was cause-related, and he was entitled to a surgery. There was some arthritis there. Subsequent to the visit with Dr. Ritter in 2010, Dr. Ritter gave us a deposition. In that deposition, Dr. Ritter indicated that, first of all, the loss of the meniscus is like a car without a tire, that the suspension system goes more quickly because of that fact. The same thing with the meniscus. The knee deteriorates faster than it would if there were anything other than that. He indicated that the meniscus is not functioning normally. The cartilage will wear quickly, which accelerates the development of arthritis. That's at C427, 428. The meniscus tear, plus the lack of treatment for three years, caused the condition that he has now. It's the need for a total knee replacement. Well, Dr. Nagolsky examined the old records, and in my reading of his report, he tends to pick at what the commission decided in the first case. He didn't even acquiesce that there was a meniscus tear to the knee in 2007. All right, so you recognize that Nagolsky provides a causal connection opinion that goes against the claim. We know that. Okay. Ritter goes the opposite way. So are you telling us that there are some foundational problems with Nagolsky's opinion that would totally undermine his opinion? I think that there is, yes, that he said that there was no torn meniscus in 2007 in his notes. Dr. Ritter and Dr. Levitt found it on an MRI in 2007. I think that's part of the reason how he figures that this is not related to the original accident. Well, the commission was bound by its earlier decision that the torn meniscus was related under the law of the case doctrine. I would say so, yes, so, Your Honor. I mean, that was decided, it was appealed to the circuit court. Right. Not further. Not further. So that issue could not be revisited by the commission. I understand. But that's not necessarily what they did, though, is it? I mean, they said his need for total knee replacement is not related to the original accident. And that's what we're arguing about, yes, sir. Right. That's what Nagolsky said. The commission… Which one was Nagolsky's opinion? Yeah. Which one was Nagolsky's? Yes. The second opinion, the second IME opinion. Is that what you're asking, Your Honor? Well, just, I mean, that's what this decision is based on is his opinion. Is that correct? The decision of the arbitrator and the commission are based on Dr. Nagolsky. So why couldn't they rely on Nagolsky's opinion? Is there a foundational error or frail question? I think he misstates some of the facts, is what I do think. He, first of all, as I said earlier, didn't believe that there was a meniscus tear, which two doctors in the commission had found. He thinks it's a degenerative condition. He thinks the man's problems with his knee were much more extensive in the arthritis-type problem than they were as a meniscus problem. But if you look at the records from 2007, both Dr. Levin and Dr. Ritter did not think arthritis was a problem with his knee. He had some, yes. There's no denial that it was there. But it progressed, and it's going to progress when the meniscus wears out. Therefore, that's why I don't think that Dr. Nagolsky's opinions are really sound. And the commission, when they made their finding, indicated that because he continued significant labor, well, he was working as a truck driver, but he wasn't doing anything radically physical with his knee other than getting in and out of the truck a couple times. Well, not a couple times, three to five times. And he wasn't loading or unloading. And there's no description of the demands of the over-the-road driver. And then they argue about him not getting medical care. Well, he really had no backup for the payment of medical care. The respondent was appealing the case, so they were not agreeing that there was any type of causal relationship. And secondly, he didn't have group insurance to pay for anything. He needed to work. So it is my belief that they relied inappropriately on Dr. Nagolsky's opinions, which I've stated them in the brief. The meniscus tear was there previously. He didn't think so. Dr. Ritter, when he read Dr. Nagolsky's report, said that he was confused by the assumption that the knee in 2007 was due to degenerative arthritis. And that's at page 428 and 429. The meniscus tear, according to Dr. Ritter, significantly contributed. Dr. Nagolsky is saying that it isn't there and it isn't a factor. And from the 2007 decision finding the meniscus tear, I don't know how you can argue that it isn't a factor from the doctor's opinion. Anyway, I believe that, and I know I've been here enough times and long enough, you don't like to change factual issues. I understand that. But I think this one needs to be changed. The factual result from the commission, I think, is just totally wrong. I don't understand why they did it in a sense. In some other senses, which I won't mention, I understand why they did it. I would ask this court to really take a look at the evidence, take a look at the reports, take a look at the decision, and I think you will agree with me that the commission's decision is erroneous on a factual status. Questions? I don't believe there are. Thank you, counsel. Counsel, you may respond. Thank you. Brad Elward on behalf of Ms. Baum-Trucking. We're asking to confirm, to affirm the commission's decision to deny benefits that are associated with the total knee replacement here. And I think this, as the court's already identified in some of its comments to counsel, is a classic case of doctor versus doctor. That's exactly what this came down to. Well, is it really that? Or is it more there's no foundation, proper foundation for one doctor's opinion, whereas there is a finding by the commission earlier that was the foundation for two other doctors' opinions? I don't think it's foundational at all. First of all, they made no effort whatsoever to strike the doctor's opinions based on a lack of foundation or anything of that nature. That's an important point because if there isn't, and if there is some blatant, I'm not describing this case, but if there was a case where there was some blatant flaw in the foundational basis and there was no objection made, it basically comes to this court for consideration of that opinion without taking into consideration the foundational flaw. Is that true? Well, perhaps if it was an extreme situation, such as a doctor reviewing the wrong records or a physician that didn't treat the individual and confusing them, something like that, perhaps you could make that statement. But in this case, this is a matter of weighing the opinions. We've got opposing opinions in this case. And I would encourage you to take a close look at the way that Dr. Nagolsky walked through the records that he reviewed. He did a records review in this case where he reviewed the MRI film, he reviewed the x-rays, he made the comments based on those. He looks at the records of Dr. Collins, Dr. Kearsey, Dr. Ritter, and also made a comment with respect to Dr. Nagolsky not considering that there was a prior tear. But when we look at page C28 of the record, his report specifically says there was a concern for a medial meniscus tear. Then he goes on, he says, Dr. Ritter felt there was a medial meniscus tear of the posterior horn of the medial femoral condyle OCD lesion. And he goes on again and talks about it. He clearly understood that in 2007 that there was a tear in the meniscus. And the commission was bound by that prior decision. You agree with that, don't you? Well, they were. The medial meniscus tear was caused by the 2007. They were with respect to that. But the question here when we came back is not, we were not relitigating the question of the tear. We were not relitigating whether or not the surgery that was originally ordered by the commission was reasonable or whether it should have to have it based on its current condition. As a matter of fact, his own doctor, Dr. Ritter, says that you don't need that surgery anymore. And he says you need the total knee replacement. The question is, is the total knee replacement related to the original accident? And their doctor says yes. And our doctor says no. So when opposing counsel says that Nagolsky missed the meniscus tear, you're saying that in rendering his causation opinion he was aware of the meniscus tear? Well, I think you have to conclude that based on his report here. And he makes references to it over and over and over in his report. I'm not making supposition. They're right in the report. So I think what Dr. Nagolsky did is he took a look at the condition that was being presented and said this is a degenerative condition related to osteoarthritis. This is not a natural progression of what had happened before the prior injury. And he said it's not causally related. And their doctor looked at it and said, I think it is a natural progression. So that's the classic doctor's opinion versus doctor's opinion. I know that your doctor doesn't have to identify a cause here. He can just simply refute that there was a causal connection. But did Dr. Nagolsky attempt to explain why it is that he had reached that point where a total knee replacement was necessary? He talked about, at the bottom of page 228 and the top of 229, the deterioration, significant loss of articular cartridge and changes around the knee that would suggest he had significant preexisting problems. He continues to talk about how the symptoms continue to develop. So, yeah, I think he does. I mean, I would agree that certainly you can, as an employer, the physician can say that's not related and stop. But here I do think he tried to offer an alternative explanation. This is a degenerative condition that preexisted that continued to deteriorate over time and led to the total knee replacement, which is a different question than whether or not the original meniscus tear was related. And that's not before the court at all. And, again, the question is, which of the two physicians' interpretation of the need for the total knee replacement and its relationship to the original accident was the commission to accept? I mean, if the commission would have went the other way and found it compensable, then very well, I could be standing up here making the exact same argument. And I would say if I were reviewing it, it's the same result. You don't like the result. The commission evaluated the medical opinions. One doctor might be criticized for this aspect. Another doctor might be criticized for a different aspect. But in the end, somebody's got to weigh that and come up with a conclusion. The commission did that. And they just don't like the fact that they didn't relate it. I think the one thing that is missing from this discussion that we've had so far is that there were two real findings by the commission here I think are important. Naturally, we talked about the medical opinion evidence. But the commission found it significant that both doctors discussed this period of time between the 2007 accident and the opinions and the Dr. Ritter's opinions back in 2010. And Dr. Nagolsky said he found it significant that there was a delay. And the commission found the delay significant, the delay in seeking additional treatment, the returning to work full-time, working as a 500-mile round-trip driver five days a week, climbing in and out of a truck 20 times a day, performing your job to full job performance without restrictions, never missed a day of work, sought no medical treatment. Now, the commission found that significant. Significant in what sense? They had a window of about three and a half years where he was able to return to work after he was told he needed a meniscus repair. He returns to work without restrictions, performs the job. They concluded it was a strenuous job. That's a fact question. They concluded it was a strenuous job. They found that to be significant as to whether or not there was a break in the original condition and where he appeared and where he presented in 2010. I think that's exactly what the commission did. They said someone who has this medical request to have the surgery performed, meniscus repair, and then goes on and does this work for three and a half years without any attempt to see a doctor, without any restrictions, et cetera, that there's enough of a break. Now, they didn't say the word break, but I think that's a clear implication of what the commission's decision said. And I think it's important because counsel also, our trial counsel, asked Dr. Ritter if this delay and the return to work and the return to work without restrictions, the ability to work as a trial provider, was significant. He said no. And the commission attached to that and said, well, we don't find Dr. Ritter's opinions to be persuasive because he doesn't give any credit to the three and a half year window. And I think that's very important in this case, and that's something we really haven't talked about. But I think that underpins the commission's perspective on these two medical opinions  And Dr. Nagolsky's opinion is entitled to more weight because during that period of time that he's working with a diagnosed, found, and this repair, that that supports the development of osteoarthritis as the causation for having to have a knee replacement. What I'm saying is that the commission here was reasonable to conclude that Dr. Nagolsky's opinions and his explanation of the continuing deterioration of a degenerative condition over time was consistent with the gentleman who had told you needed a meniscus repair. He doesn't get it done, goes back to work, works full time as a truck driver for three and a half years, and seeks no further medical. He found that Dr. Nagolsky's opinion, when coupled with that, was more consistent and more, how do you put it, more consistent with common sense is what I'm looking for. But Dr. Nagolsky's opinions concerning the need for total knee replacement to the issues other than the work makes more sense from a medical and a common sense perspective. And I think that's exactly what the commission was talking about is that period of time. And I think that's very important. Now, Council mentions Dr. Levin, and I want to touch upon him for just a second or two before I close. Dr. Levin did offer some medical opinions relating to the first accident, well, the first arbitration in 2007. And he was looking at the petitioner at that point in time and offering his opinions at that point in time. His opinions do not relate to 2010 or any time afterwards. So we had a very limited snapshot. And essentially how I interpret Dr. Levin's opinions are he said that a person with a preexisting condition would be more likely to develop a tear. But he doesn't talk about at all in his opinion whether or not a tear would progress to a need for a total knee replacement. So I think for the purposes of why we're here today, evaluating the second commission decision, Dr. Levin's opinions really are, they don't mean anything. And they don't offer. That's correct. Those are the two that were actually offered as part of this. I understand you can look back for a comparison basis, certainly. But the opinions that were given by Dr. Levin were in 2007, six years prior, five years prior to the arbitration in this case. And I don't think they hold any weight whatsoever about the condition of the petitioner in the second arbitration. And that's what we're really here about, the condition of the petitioner in the second arbitration. Do we have any opinion that says a meniscus tear over time leads to the need for a knee replacement? I think that was the gist of what Dr. Ritter was trying to say. I think that was the gist of what he was trying to say. It may not have been as many words, but I think that's what they're resting their case on. Our doctor says the opposite. So, again, it comes back to the weighing of the evidence and the weighing of the evidence. And it's only, you say, Minkowski's idea that you take that three-year period of time of working with a meniscus tear and being able to do that somehow negates the relationship between the tear and the need for a knee replacement because there's a degenerative condition ongoing of osteoarthritis. I think I'm following you. I think that's the implication. Dr. Minkowski's opinion, the implication is that this period of time where he doesn't seek care, he returns to work, his justification for why it's a degenerative condition developing or degressing over time, I think that's how we read his opinion. And I think that's how the commission took that opinion in conjunction with this other evidence that we just talked about. I don't want to repeat it again, but I think that's where you get to the point when the commission makes the comment that they find that the cause being unrelated to the employment makes more sense from a medical and common sense perspective. The common sense perspective is if you're ordered to have a procedure or you're allowed to have a procedure and you don't have the procedure and you go back to work, have no restrictions, et cetera, and then you have a need for another procedure, you can say that they're not related. I think that's what the commission did here. Is this an articulated opinion, a 100% articulated opinion? Probably not. But the gist of what the commission is saying here is no, there's a break in time. When you say no restrictions, from whom were the no restrictions given? Probably Dr. Ritter, but I don't have a direct answer. You mean back originally? Yeah. If I recall, I get that comment, I believe, from the petitioner's question. The question of the petitioner at the arbitration, that's where I'm relying on. I don't recall that being from a doctor, but I think it came from the petitioner's testimony. That's where we got that. It's cited in a brief. There's a record cited in a brief. Again, we think this is a classic case of doctor versus doctor, and we would ask you in this case to just affirm the commission's decision. Thank you. Thank you, counsel. Counsel, you may reply. Thank you, Your Honor. I'll be very brief. Counsel cited that. Oh, you have five minutes. Oh, gee, all that? Thank you. Then I'll have another flat tire, I'm sure. The quote that counsel, Mr. Elbert, indicated from Nagelsky, was that reasonably required surgery for meniscus, if indeed, was the initial problem. Again, he's going back, in my opinion anyway, he's going back to say that the meniscus tear wasn't what the commission found was something else. And you asked about the causal relationship. Dr. Ritter did say that once the tear is there, and if it isn't attended, it will wear away faster. And arthritis, ultimately a total knee replacement, which is where I'm standing at this point, is very likely. I don't condone that he didn't get medical care for three years, but he didn't have a choice. The applicability of the statute provision for doing something injurious to yourself doesn't take you out of compensability here because he couldn't get care, is that right? He could not get care furnished for him either by group or by comp, no. It wasn't until after we went through the whole appeal process on the first case. So I still think the commission is contrary to the manifest way to the evidence. Unless there's any questions, I thank you. Mr. Elbert, thank you. I don't believe that. Thank you, counsel, both for your arguments on this matter. It will be taken under advisement. The written disposition shall issue.